IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. LISA SCHNEIDER,              :
                                 :      CIVIL ACTION
            Plaintiff,           :      NO. 07-664
                                 :
                                 :
        v.                       :
                                 :
THE ARC OF MONTGOMERY COUNTY,    :
et al.,                          :
                                 :
            Defendants.          :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          July 25, 2007


        Presently before the Court is Defendants' Motion to
Dismiss Plaintiff's Amended Complaint (doc. no. 9).  The central
question presented by this motion is whether a publicly funded,
private, non-profit organization that provides services to
developmentally disabled individuals is engaged in actions that
are traditionally and exclusively within the province of the
Commonwealth of Pennsylvania and thus can be considered a state
actor for purposes of Section 1983 liability.  Because the
organization is not a state actor, the Court will dismiss
Plaintiff's amended complaint.


I.   BACKGROUND

        The facts of this case are straightforward.  Plaintiff,
Dr. Lisa Schneider, was the Director of Children Services at the

Arc of Montgomery County ("The Arc") and the Arc of Montgomery
County Foundation ("MARC").  According to Dr. Schneider's own
complaint, both Defendants are non-profit corporations that
provide social services to developmentally disabled individuals.
Amend. Compl. ¶¶ 4-6 (doc. no. 8).  Defendants receive federal,
state, and/or local government funding to perform these services.
Id. ¶ 6.

        Dr. Schneider alleges that she was terminated after she
reported Defendants' use of public funds to build a new
headquarters building for Defendants.  Id. ¶ 15, 17, 23.  Her
reports included allegations of improper use of excess funds,
failure to pay prevailing wages, and improper use of retained
revenues.  Id.  She also alleges that Robert G. Mochan was
terminated, like her, for speaking out on matters of public
concern.[1]  Id. ¶ 26.  Dr. Schneider alleges that, by terminating
her, Defendants violated 42 U.S.C. § 1983 and the Pennsylvania
Whistleblower Law, 43 P.S. § 1421, et seq.


## II.  MOTION TO DISMISS

        Defendants move to dismiss Dr. Schneider's amended

---

        [1]   Dr. Schneider's colleague, Mr. Mochan, also brought an
action against Defendants for his alleged retaliatory
termination.  Judge Kauffman dismissed the case, finding that Mr.
Mochan had failed to properly allege state action.  Mochan v. The
Arc of Montgomery County, 2007 WL 655604 (E.D. Pa. Mar. 2, 2007).

complaint on the grounds that she has not alleged facts that, if true, would establish that Defendants were acting "under color of state law."  For the following reasons, Defendants' motion will be granted.

A.   Legal Standard

A plaintiff seeking relief under § 1983[2] must show that she has been deprived of a right secured by the Constitution and laws of the United States and that the defendant was acting under color of state law.  Harvey v. Plains Twp. Police Dep't., 421 F.3d 185, 189 (3d Cir. 2005).  The "color of state law" prerequisite to § 1983 liability is, in most contexts, identical to the "state action" requirement under the Fourteenth Amendment. Showell v. Acorn Housing Corp., 1997 WL 597897, at *2 (E.D. Pa. Sept. 17, 1997) (Robreno, J.).  Therefore, the primary issue before the Court is whether Defendants were acting under color of state law at the time Dr. Schneider was terminated, and whether

---

[2]     42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

they may be appropriately characterized as state actors for purposes of § 1983 liability.

In <u>Leshko v. Servis</u>, 423 F.3d 337, 340 (3d Cir. 2005), the Third Circuit divided state action cases into two categories: (1) cases challenging an activity that is "significantly encouraged by the state or in which the state acts as a joint participant"; and (2) cases involving an actor that is "controlled by the state, performs a function delegated by the state, or is entwined with government policies or management." <u>Id.</u>  In the first category, determining state action "requires tracing the activity to its source to see if that source fairly can be said to be the state.  The question is whether the fingerprints of the state are on the activity itself." <u>Id.</u>  In the second category, private action may be characterized as state action if the private actor "is so integrally related to the state that it is fair to impute to the state responsibility for the action.  The question here is whether the state so identifies with the individual (or entity) who took the challenged action that we deem the state's fingerprints to have been on the action." <u>Id.</u>

B.   <u>Discussion</u>

Dr. Schneider points to two allegations that she argues support her claim that Defendants are state actors.  Both of

these allegations fail to support her claim.

        1.   <u>Receipt of Public Funding</u>

First, Dr. Schneider points to the fact that Defendants receive public funds in support of her claim that Defendants are state actors, as receipt of these funds purportedly shows Pennsylvania "significantly encourage[s]" their activities. Amend. Compl. ¶¶ 6, 22.  The receipt of public funding for an activity is not sufficient to infer a sufficiently "close nexus" between the Defendants and Pennsylvania such that Defendants' actions may be deemed to be Pennsylvania's, even when such funds are coupled with comprehensive regulations governing that activity.  The Third Circuit has resoundingly rejected any argument to the contrary.  <u>See</u>, <u>e.g.</u>, <u>Crissman v. Dover Downs Entm't</u>, 289 F.3d 231, 244 (3d Cir. 2002) (holding that detailed regulation and receipt of state funds to operate a horse race track, without more, did not create state action); <u>Leshko</u>, 423 F.3d at 341 (rejecting argument that, because Pennsylvania funded and regulated foster care services, foster parents' decisions regarding care of child constituted state activity).

Dr. Schneider does not sufficiently allege that Pennsylvania "forced or encouraged, or jointly participated in, the [Defendants' particular decision to terminate her], and therefore she states no claim of state action on the basis of

state . . . funding." <u>Leshko</u>, 423 F.3d at 341.

> 2.  Activities within the Traditional or Exclusive
> <u>Province of the State</u>

Dr. Schneider also alleges that Defendants are engaged in actions that are traditionally and exclusively within the province of the state.  Pl.'s Mem. of Law at 6; Amend. Compl. ¶ 22.  These actions include the "care, education, and support of developmentally disabled adults and children and the provision of what its website describes as a children's 'full learning program' featuring teachers and therapists." <u>Id.</u>  These allegations present a more difficult question for the Court to answer.

As part of its inquiry under the second prong of the state-actor test, the <u>Leshko</u> Court examined whether the private defendants were performing a function that was "traditionally and exclusively" within the province of the state. <u>Leshko</u>, 423 F.3d at 341.  If so, it held, "regardless of their formal designation by the state, they are state actors." <u>Id.</u> at 343.  In examining whether Defendants' activities are traditionally and exclusively within the province of the state, the court must look to the "historical practice of the state at issue, rather than at national trends." <u>Id.</u> at 344 n.4.  This inquiry sets forth a rigorous standard that is rarely met.  Courts have noted that

"while many functions have been traditionally performed by governments, very few have been exclusively reserved to the state." Graham v. City of Phil., 2002 WL 1608230, at *6 (E.D. Pa. July 17, 2002) (citations omitted).

In Pennsylvania, as with the United States more broadly, the care of individuals with developmental disabilities has traditionally been seen as a family and local concern. See James W. Trent, Inventing the Feeble Mind: A History of Mental Retardation in the United States 2 (1994); Okunieff v. Rosenberg, 996 F. Supp. 343, 355 (S.D.N.Y. 1998) ("Since the beginning of the United States, families, friends, and guardians have cared for the mentally ill privately.") (citing Henry M. Hurd et al., 1 The Institutional Care of the Insane in the United States and Canada 40 (Johns Hopkins Press 1916)). It was not until the mid-1800s that the concern became one of society and the state. Trent, supra, at 2. Pennsylvania played a leading role in developing programs for the developmentally disabled in 1853, when Philadelphia citizens established one of the first American institutions for the developmentally disabled, a private school called the Pennsylvania Training School for the Feeble-Minded. Id. at 15.[3] Citizens in other states followed this example soon

---

[3]     The Pennsylvania Training School, now known as the Elwyn Training school, still survives today in Media as a non-profit organization. See Trent, supra at 102; Elwyn, The Story of Elwyn, available at http://www.elwyn.org (last visited July 24, 2007).

afterwards, establishing similar schools in their own states.
Id.

The Pennsylvania Training School initially depended on
income from the families and wards of private-paying pupils.  Id.
at 62.  After the Civil War, however, family and social
disruption led to a growing number of applications to such
institutions, which found themselves without the resources to
meet the growing demand for their services.  Id. at 62-63.  The
new superintendent of the Pennsylvania Training School, Dr. Isaac
N. Kerlin, believed that postwar demands for the school could
only be met with public funds, and he was successful at regularly
obtaining those funds from state legislatures.  See id. at 63.

These early institutions began as relatively small
centers, often located within the community, in which intensive
training could be concentrated.  See Halderman v. Pennhurst State
Sch. & Hosp., 446 F. Supp. 1295, 1299 (E.D. Pa. 1977) (citing
Wolf Wolfensburger, The Origin and Nature of Our Institutional
Models 24-56 (1975)).  Their emphasis was on education, and they
were viewed as temporary boarding schools, geared toward
returning the individuals to their family or living group once
appropriate skills were learned.  Id. By the late nineteenth
century, however, private schools were being replaced by
gargantuan, state-managed asylums that were isolated from the
community grew to be viewed as permanent residential facilities

-8-

for the developmentally disabled and other perceived "deviants."
Id. 1299-1300.  Typical of such asylums was Pennsylvania's
Pennhurst State School and Hospital, which "[s]ince its founding
in 1908, [had] been overcrowded and understaffed."  Id. at 1302.
By the 1960s, Pennhurst housed over 4,000 residents.  Id.

In the 1960s, large state asylums, such as Pennhurst,
came under attack as inadequate modes of providing services to
the developmentally disabled.  Id.; Trent, supra, at 63.  This
attack was partly a reaction to the horrid conditions of state-
run asylums and partly due to a new understanding that
developmentally disabled individuals could benefit from placement
in smaller community living arrangements ("CLAs") were they could
be normalized into society.[4]  See Halderman v. Pennhurst State
Sch. & Hosp., 555 F. Supp. 1144, 1148 (E.D. Pa. 1983).

A landmark in Pennsylvania's provision of services to
the developmentally disabled occurred when Pennsylvania passed
the Mental Health and Mental Retardation Act of 1966, P.L. 96, §
406, codified at, 50 Pa. Cons. Stat. § 4101, et seq. (the "MH/MR

---

[4]     This shift in focus was, in turn, the result of new
methods for determining the capabilities of the most seriously
disabled individuals.  Leigh L. Puryear, Note, Youngberg v.
Romeo: Moving Toward a Constitutional Right to Habilitation for
the Mentally Retarded, 62 N.C.L. Rev. 162, 172 (1983).  "As a
result [of these methods], a dramatic reassessment of the
learning potential of severely retarded individuals has occurred,
producing extensive documentation of the improvements that can be
achieved by these individuals in self-help, language, and
vocational skills through appropriate instructional techniques."
Id. (internal footnotes omitted).

Act"). The MH/MR Act provides the state and counties with the authority necessary to provide comprehensive services and care to the developmentally disabled. For example, the MH/MR Act provides that the responsibilities of the Department of Public Welfare include establishing an adequate number of health facilities to meet the needs of the mentally ill, coordinating efforts among counties and other agencies to ensure the quality of services offered to the mentally ill, providing funding for services, determining the type of program each facility will offer, and making sure the facilities are performing their functions correctly. Id. §§ 4201-02. The MH/MR Act also provides that "local authorities . . . shall establish a county mental health . . . program for the prevention of mental disability, and for the diagnosis, care, treatment, rehabilitation and detention of the mentally disabled." Id. § 4301(a).

After its passage, the federal district court for the Eastern District of Pennsylvania played a prominent role in ensuring Pennsylvania's compliance with the MH/MR Act. In Halderman, a case that spanned two decades, the late Judge Raymond J. Broderick ordered that Pennhurst be phased out and that its residents be integrated into local communities pursuant to the MH/MR Act. 446 F. Supp. at 1295. Today, as a result, Pennsylvania has successfully phased out the use of large

institutions, such as the now-abandoned facilities as Pennhurst, and both manages and funds numerous community facilities that provide habilitation services to the developmentally disabled.[5] See Halderman v. Pennhurst State Sch. & Hosp., 995 F. Supp. 534, 535 (E.D. Pa. 1998) (discussing a special master's findings that Pennsylvania has substantially complied its statutory mandate to provide developmentally disabled with habilitation, training, and care); see also Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 178 (3d Cir. 2000) (discussing Pennsylvania non-profit corporation that provides developmentally disabled individuals with community health centers, transportation services, and community living facilities and assistance through state and federal funding); Growth Horizons, Inc. v. Delaware Cty., 983 F.2d 1277, 1279 (3d Cir. 1993) (discussing private Pennsylvania corporation that provides community living arrangements, through contract with Delaware County, to developmentally disabled individuals "in as normal an environment as possible").

In summary, the history of Pennsylvania's provision of care, education, and other services to the developmentally disabled shows that, while Pennsylvania's administration and funding of such services has grown with time, providing "care, education, and support" to developmentally disabled individuals

---

[5]     The proceedings of Halderman are summarized succinctly in Halderman v. Pennhurst State Sch. & Hosp., 995 F. Supp. 534, 540 (E.D. Pa. 1998).

has never been, and is not now, a traditional and exclusive government function.  Cf. Leshko, 423 F.3d at 344 (holding that the fact that Pennsylvania had over time begun to administer aspects of the foster care system, previously performed privately, did not make the provision of foster care services an exclusive governmental function).  That the provision of services to the developmentally disabled has evolved to become a public function does not make it a traditional and exclusive function of the state.  See, e.g., Rendell-Baker v. Kohn, 457 U.S. 830, 841-42 (1982) (holding that privately-operated school for maladjusted high school students, while serving the public, did not perform a task within the exclusive province of the state); Graham, 2002 WL 1608230, at *6 (holding that non-profit social service agency which provided support service to people affected by HIV did not perform an exclusively governmental function).  In fact, the MH/MR Act recognizes that providing such services is traditionally a private role, requiring that "[w]henever public funds are expended . . . on behalf of a mentally disabled person, the governmental body expending such funds may recover the same from such person," subject to certain restrictions.  50 Pa. Cons. Stat. § 4501.

        Also important to this decision is the fact that the care and habilitation of the developmentally disabled does not implicate a constitutional right.  In Leshko, the Third Circuit

distinguished care for foster children (held not to be state action) from the provision of medical care to inmates (held to be state action), on the basis that the former was a mandate of statutory creation while the latter was a constitutional obligation.  423 F.3d 337, 344-45 (citing West v. Atkins, 487 U.S. 42, 56 (1988).[6]  As the Third Circuit explained:

> Constitutional obligations on a state obviously are powerful evidence that the required functions are traditionally governmental, but here there are no such obligations. . . . [S]tate-supervised foster care in Pennsylvania is a creature of statute, begun in 1901 under Pennsylvania's Juvenile Act.  Statutory duties of even such early vintage are not traditionally governmental.

Id. (footnote omitted).  The provision of community based social services to the developmentally disabled is a "creature of statute" of relatively late vintage at that, which began with the passage of the MH/MR Act of 1966.  See also In re Schmidt, 429 A.2d 631, 634 (Pa. 1981) (discussing statutory responsibilities of the state and county to provide "mental retardation services").  Like the provision of foster care, neither the federal Constitution nor the Pennsylvania Constitution requires that the state provide services to the developmentally disabled.

Yet even if Pennsylvania had traditionally provided services to the developmentally disabled since its founding as a

---

[6]      In West, the Supreme Court held a private doctor to be a state actor where, in an institutional context, he performed medical services as part of a function traditionally and exclusively reserved to the state.  487 U.S. 4 at 56.

British colony, it still has never been Pennsylvania's
"exclusive" province to do so.  As noted earlier, private
families have cared for their developmentally disabled members
since the earliest history of this country, and they continue to
do so today.  See, e.g., Youngberg v. Romeo, 457 U.S. 307, 309
(1982) (discussing case of "profoundly retarded" plaintiff who
lived with his parents in Philadelphia for the first 26 years of
his life, and was only committed to a state facility after the
death of his father, when his mother became unable to care for
him).  Indeed, even in the context of providing residential
services, it is today the express policy of Pennsylvania that "a
mentally retarded person shall not be determined to require
involuntary residential placement unless the degree of
retardation shows an inability to provide for the most basic
personal needs and provision for such needs is not available and
cannot be developed or provided for in the existing home or in
the community in which the individual resides."  In re Schmidt,
429 A.2d at 634.  It bears repeating that "[w]hile many functions
have been performed by governments, very few have been
exclusively reserved to the state."  Flagg Bros., Inc. v. Brooks,
436 U.S. 149, 158 (1978) (emphasis added).

        Finally, the Court's decision is in accord with other
courts that have held that the provision of services to the
developmentally disabled does not constitute a function that was

-14-

traditionally and exclusively within the province of the state.
See Mochan, 2007 WL 655604, at *4 (finding specifically that The
Arc and MARC, Defendants in this case, are not engaged in
activities traditionally or exclusively within province of the
state); Sybalski v. Ind't Group Home Living Program, Inc., 2007
WL 1202864, at *5 (E.D.N.Y. Apr. 24, 2007) (holding that private
home engaged in providing "custody, care and habilitation
services to mentally retarded citizens" was not involved in a
public function "traditionally and exclusively resrved to the
state"); Dow v. Terramara, Inc., 835 F.Supp. 1299 (D. Kan. 1993)
("[I]t cannot be said that providing services and housing to
mentally handicapped adults has been "traditionally the exclusive
prerogative of the State.").

Dr. Schneider cites to Fialkowski v. Greenwich Home for
Children, Inc., 683 F. Supp. 103, 105 (E.D. Pa. 1987), in support
of her argument that Defendants are state actors.[7]  In that case,
the court found that the defendants acted pursuant to delegated
statutory authority in providing residential services to mentally
retarded citizens, and thus were acting as state actors when they
negligently allowed one of their residents choke on his food.
Id.  Fialkowski is unavailing to Dr. Schneider for three reasons.

_____

[7]      Dr. Schneider also cites Kentucky Ass'n for Retarded
Citizens v. Conn, 510 F. Supp. 1233, 1250 (W.D. Ky. 1980).  This
early case provides only a scant paragraph discussing its holding
that a private residential treatment center for mentally retarded
individuals was a state actor for § 1983 purposes.

First, here, there are no allegations that Defendants were providing residential services to developmentally disabled individuals who had been committed to their care.  Rather, the allegations in this case are that Defendants merely provide "care, education, and support of developmentally disabled adults and children" within the community.  Amend. Compl. ¶ 22; Leshko, 423 F.3d at 345-47 (noting that foster care services provided in a residential institution are more likely to constitute state action than those provided in private setting).  Second, in Fialkowski, the court found that the defendants were acting pursuant to delegated statutory authority in providing residential services to the developmentally disabled.  Here, Dr. Schneider maintains that Defendants are providing services within the traditional and exclusive province of the state, not that they are acting pursuant to delegated statutory authority.  Third, in Fialkowski, the plaintiff was a developmentally disabled individual whose suit was related to the allegedly negligent provision of services to the disabled.  Assuming arguendo that Defendants' provision of services was within the traditional exclusive province of the state, Dr. Schneider's suit is not related to the provision of those services.  Rather, she brings a suit based on Defendants' terminating her employment, based on actions unrelated to Defendants' provision of services to the developmentally disabled.  See Graham, 2002 WL 1608230, at

-16-

*6 (holding that termination of an employee of a non-profit agency which provided support service to HIV patients was not state action where the state did not control or manage the agency's workforce).

Thus, the Court finds that Dr. Schneider has failed to allege that Defendants were state actors, as she must, to survive a challenge under Rule 12(b)(6) to her § 1983 claim.  There is not "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Leshko, 423 F.3d at 347 (quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)).


### 3.   Fact-Specificity of the Inquiry

Dr. Schneider also argues that the issue of whether a defendant is a state actor involves a highly fact-specific inquiry that cannot be decided on a motion to dismiss, but rather, must be decided through a summary judgment motion.  See Pl.'s Mem. of Law at 5.

Numerous courts, including this Court, have granted motions to dismiss section 1983 actions because the defendants were not state actors.  See, e.g., Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974) (affirming grant of a motion to dismiss); Leshko, 423 F.3d at 337 (affirming grant of a motion to

dismiss); <u>Community Med. Ctr. v. Emerg. Med. Servs. of Ne. Pa.,</u> <u>Inc.</u>, 712 F.2d 878 (3d Cir. 1983) (affirming grant of a motion to dismiss); <u>Mochan</u>, 2007 WL 655604; <u>Graham</u>, 2002 WL 1608230; <u>Klavan</u> <u>v. Crozer-Chester Med. Ctr.</u>, 60 F. Supp. 2d 436 (E.D.Pa. 1999) (Dalzell, J.); <u>Ctr. for Bio-Ethical Reform v. Comcast-Spectacor,</u> <u>Inc.</u>, 1999 WL 601014 (E.D. Pa. Jul. 29, 1999) (Kauffman, J.); <u>Showell</u>, 1997 WL 597897.

Dr. Schneider's argument might have merit if she presented to the Court how allowing her to take discovery might develop facts that would allow her to sufficiently allege that Defendants are state actors. However, she has made no such presentation. Accordingly, the Court will not hesitate to dismiss Dr. Schneider's § 1983 claim.

C.   <u>State Law Claim</u>

In addition to her § 1983 claim, Dr. Schneider has alleged violations of the Pennsylvania Whistleblower Act. Defendants urge the Court to decline supplemental jurisdiction if the § 1983 claim is dismissed. A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. <u>See</u> <u>E.E.O.C. v.</u> <u>Creative Playthings, Ltd.</u>, 375 F. Supp. 2d 427, 432 (E.D. Pa. 2005). The Third Circuit has instructed that "[i]f it appears that the federal claim is subject to dismissal . . . the court

-18-

should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances." Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976).

Because the Court has decided to dismiss Dr. Schneider's § 1983 claim, the only claim over which it had original jurisdiction, it will decline to exercise supplemental jurisdiction over the remaining state law claim.

## III. MOTION FOR LEAVE TO AMEND COMPLAINT

Dr. Schneider has also moved for leave to file a Second Amended Complaint so that she can add a third Defendant, MARC Children's Services, to the case (doc. no. 10).  Although amendments to pleadings are liberally granted, a district court has discretion to deny a request to amend if it is apparent from the record that the amendment would be futile.  Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (citing Foman, 371 U.S. 178, 182 (1962)).  In inquiring as to when amendment would be futile, the Court applies the same standard used in a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  An amendment may be considered futile "if the amendment will not cure [any] deficiency in the original complaint or if the amended complaint cannot withstand a motion to dismiss."  Glaziers & Glass Workers

<u>Union Local No. 252 Annuity Fund v. Janney Montgomery Scott,</u>
<u>Inc.</u>, 155 F.R.D. 97, 100 (E.D. Pa. 1994).

Here, Dr. Schneider's proposed Second Amended Complaint does not contain any additional allegations that would allow her to survive a motion to dismiss pursuant to Rule 12(b)(6). Allowing her to amend would be futile.  Accordingly, the Court will deny Dr. Schneider's motion for leave to file a Second Amended Complaint.

**IV.  CONCLUSION**

For the foregoing reasons, the Defendants' Motion to Dismiss Plaintiff's Amended Complaint will be granted, and Dr. Schneider's Motion for Leave to Amend Complaint will be denied. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DR. LISA SCHNEIDER,     :
                         :   CIVIL ACTION
          Plaintiff,    :   NO. 07-664
                         :
                         :
         v.             :
                         :
THE ARC OF MONTGOMERY COUNTY, :
et al.,                   :
                         :
         Defendants.   :

## O R D E R

**AND NOW**, this **25th day** of **July, 2007,** it is hereby

**ORDERED** that Defendants' Motion to Dismiss Plaintiff's Amended

Complaint (doc. no. 9) is **GRANTED.**

It is **FURTHER ORDERED** that Plaintiff's Motion for Leave

to File a Second Amended Complaint (doc. no. 10) is **DENIED.**


**AND IT IS SO ORDERED.**


S/Eduardo C. Robreno
**EDUARDO C. ROBRENO, J.**

-21-